## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **SAMMIE DWAYNE MCPHAUL AS Special Administrator of the ESTATE OF ALFRED CORNELIUS MCPHAUL** | **Case No. 25-2337** |
| **Plaintiff,** | |
| **v.** | **JURY TRIAL DEMANDED** |
| **COLLEGE HILLS OPCO, LLC**<br>**Serve RA:**<br>Corporation Service Company<br>1100 SW Wanamaker Rd. Suite 103<br>TOPEKA, KS 6660 | |
| **CAMPBELL STREET SERVICES LLC**<br>Serve RA:<br>Corporation Service Company<br>1100 SW Wanamaker Rd. Suite 103<br>TOPEKA, KS 6660 | |
| **BIRCHWOOD HEALTHCARE PARTNERS, LLC**<br>Serve RA:<br>Illinois Corporation Service Company<br>801 Adlai Stevenson Drive<br>Springfield, IL 62703-4261 | |
| **MPAC HEALTHCARE MANAGEMENT, LLC**<br>Serve RA:<br>Illinois Corporation Service Company<br>801 Adlai Stevenson Drive<br>Springfield, IL 62703-4261 | |
| **Defendants.** | |

## PLAINTIFF'S COMPLAINT FOR DAMAGES

By and through undersigned counsel, Plaintiff, The Estate of Alfred Cornelius McPhaul submit this Complaint for Damages ("Complaint") against the above-named Defendants, and in further support, states and alleges as follows:

### PLAINTIFF

1

1.    Alfred McPhaul died on April 21st, 2024, from avoidable left and right hip pressure injuries and resulting osteomyelitis sustained at College Hills OPCO, LLC d/b/a Legacy at College Hill.

| Cause of Death:<br>OSTEOMYELITIS | Approximate Interval: Onset to Death |
|---|---|
| Other Significant Conditions: | |

2.    Decedent suffered conscious pain and suffering prior to his passing due to the avoidable pressure ulcers on his left and right hip and resulting osteomyelitis.

3.    Decedent Alfred McPhaul ("Resident") was a citizen of the state of Kansas at the time of his death.

4.    Resident was not married and had no children.

5.    Resident was predeceased by his parents.

6.    Sammie McPhaul is the Special Administrator of the Estate of Alfred Cornelius McPhaul pursuant to letter granted in case no SG-2025-PR-000040, In the Matter of the Estate of Alfred, Cornelius McPhaul, Sedgwick County District Court

7.    The Estate of Alfred McPhaul is a citizen of Kansas as Alfred McPhaul was a citizen of Kansas prior to and at the time of his passing.

## DEFENDANT

8.    Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

## COLLEGE HILLS OPCO, LLC

9.     At all times relevant, College Hills Opco, LLC d/ba Legacy at College Hill ("Facility"), was a Kansas limited liability company and owned, operated, managed, maintained, and/or controlled, in whole or in part, and did business as LEGACY AT COLLEGE HILL which is a Kansas licensed nursing home located at 5005 E 21st Street North Wichita, KS 67208.

10.    As such, Facility was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

11.    Consequently, Facility, owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at the Facility.

12.    The members of College Hills Opco, LLC d/ba Legacy at College Hill are:

13.    The sole member of COLLEGE HILLS OPCO, LLC is KS PORTFOLIO MASTER SNF HOLDCO, LLC.

14.    The members of KS PORTFOLIO MASTER SNF HOLDCO, LLC are: KS PORTFOLIO MASTER SNF HOLDCO, LLC; KS PORTFOLIO MASTER SNF HOLDCO, LLC; and KS PORTFOLIO MASTER SNF HOLDCO, LLC.

15.    Upon information and beleief, the sole member of KS PORTFOLIO MASTER SNF HOLDCO, LLC; KS PORTFOLIO MASTER SNF HOLDCO, LLC; and KS PORTFOLIO MASTER SNF HOLDCO, LLC is Isaac Dole.

16.    Isaac Dole is a citizen of Ohio.

17.     Thus, KS PORTFOLIO MASTER SNF HOLDCO, LLC; KS PORTFOLIO MASTER SNF HOLDCO, LLC; and KS PORTFOLIO MASTER SNF HOLDCO, LLC are citizens of Ohio.

18.     Accordingly, College Hills Opco, LLC d/ba Legacy at College Hill LLC and KS PORTFOLIO MASTER SNF HOLDCO, LLC are citizens of Ohio

## CAMPBELL STREET SERVICES LLC

19.     CAMPBELL STREET SERVICES LLC is Kansas limited liability company.

20.     At all times relevant to this action, Defendant CAMPBELL STREET SERVICES LLC was a limited liability company and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

21.     At all times relevant, CAMPBELL STREET SERVICES LLC, and/or individuals or entities acting on its behalf, owned, operated, managed, maintained, and/or controlled – in whole or in part – the Facility.

22.     CAMPBELL STREET SERVICES LLC, and/or individuals or entities acting on its behalf operated, managed, maintained, and/or controlled the Facility by providing nursing consulting services and exercising control over:

      a.  Staffing budgets;

      b.  The development and implementation of nursing policies and procedures;

      c.  The hiring and firing of the Administrator; and

      d.  Training and supervising nursing staff persons.

23.     These actions and business decisions had a direct impact on the care provided to all residents including Resident.

24.     Consequently, CAMPBELL STREET SERVICES LLC, owed a duty to Resident to use reasonable care for Resident's safety while under care and supervision at the Facility.

25.     The members of CAMPBELL STREET SERVICES LLC are:

a.  Andrew Sfreddo, who is a citizen of the State of Illinois;

b.  Birchwood Foundation, LLC.

   i.  The sole member is Isaac Dole, who is a citizen of the State of Ohio;

c.  Davis Square Holdings, LLC.

   i.  The sole member is Isaac Dole, who is a citizen of the State of Ohio;

d.  Birchwood Healthcare Partners, LLC.

   i.  The sole member is Isaac Dole, who is a citizen of the State of Ohio;

e.  Daniel J. Sullivan Investments, LLC.

   i.  The sole member is Daniel J. Sullivan, who is a citizen of the State of Illinois;

f.  Jacoby Consulting, LLC.

   i.  The sole member is Sara Jacoby, who is a citizen of the State of Illinois;

g.  Virtus Equity, LLC.

   i.  The sole member is Rutul Shah, who is a citizen of the State of Illinois; and,

h.  Morton Ventures, LLC.

   i.  The sole member is Brian Spaly, who is a citizen of the State of Texas.

26.     Accordingly, CAMPBELL STREET SERVICES LLC is a citizen of Ohio.

## BIRCHWOOD HEALTHCARE SERVICES, LLC

27.    Birchwood Healthcare Services, LLC is Illinois limited liability company.

28.    At all times relevant to this action, Defendant Birchwood Healthcare Services, LLC was a limited liability company and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

29.    At all times relevant, Defendant Birchwood Healthcare Services, LLC, and/or individuals or entities acting on its behalf, owned, operated, managed, maintained, and/or controlled – in whole or in part – the Facility.

30.    Defendant Birchwood Healthcare Services, LLC, and/or individuals or entities acting on its behalf operated, managed, maintained, and/or controlled the Facility by providing nursing consulting services and exercising control over:

     a.  Staffing budgets;

     b.  The development and implementation of nursing policies and procedures;

     c.  The hiring and firing of the Administrator; and

     d.  Training and supervising nursing staff persons.

31.    These actions and business decisions had a direct impact on the care provided to all residents including Resident.

32.    Consequently, Defendant Birchwood Healthcare Services, LLC, owed a duty to Resident to use reasonable care for Resident's safety while under care and supervision at the Facility.

33.    The members of Defendant Birchwood Healthcare Services, LLC is: the sole member is Isaac Dole, who is a citizen of the State of Ohio;

34.    Accordingly, Defendant Birchwood Healthcare Services, LLC is a citizen of Ohio.

## MPAC HEALTHCARE MANAGEMENT, LLC

35.    MPAC Healthcare Management, LLC is Illinois limited liability company.

36.    At all times relevant to this action, Defendant MPAC Healthcare Management, LLC was a limited liability company and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

37.    At all times relevant, Defendant MPAC Healthcare Management, LLC, and/or individuals or entities acting on its behalf, owned, operated, managed, maintained, and/or controlled – in whole or in part – the Facility.

38.    Defendant MPAC Healthcare Management, LLC, and/or individuals or entities acting on its behalf operated, managed, maintained, and/or controlled the Facility by providing nursing consulting services and exercising control over:

   a. Staffing budgets;

   b. The development and implementation of nursing policies and procedures;

   c. The hiring and firing of the Administrator; and

   d. Training and supervising nursing staff persons.

39.    These actions and business decisions had a direct impact on the care provided to all residents including Resident.

40.    Consequently, MPAC Healthcare Management, LLC owed a duty to Resident to use reasonable care for Resident's safety while under care and supervision at the Facility.

41.     The members of Defendant Birchwood Healthcare Services, LLC is: the sole member is Imothy J. Martinez, who is a citizen of the State of Illinois;

42.     Accordingly, Defendant MPAC Healthcare Management, LLC is a citizen of Illinois.

## JURISDICTION AND VENUE

43.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

44.     A substantial part of the events or omissions giving rise to the claims described in the Complaint occurred in this District of Kansas, thereby making venue proper.

45.     Defendants, purposefully availed themselves of the protections and/or benefits of the laws in Kansas by committing tortious acts within the state including, but not limited to, failing to ensure that Facility had appropriate policies and procedures for its nursing staff, was properly capitalized, funded, staffed, and that staff received adequate training and supervision, thereby making jurisdiction proper in this Court.

46.     Plaintiff brings his claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

## FACTUAL BACKGROUND

47.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows.

### Defendants' Treatment of Resident

48.     Resident was admitted to the Facility for skilled nursing care.

49.   Upon admission, Resident was or should have been identified as being at risk for developing a pressure injury.

50.   The Facility staff should have initiated a Care Plan to address Resident's risk for pressure injuries but did not implement the appropriate interventions.

51.   During Resident's time at the Facility, none of the Facility staff:

    a.  Properly assessed Resident's risk of developing a pressure injury;

    b.  Implemented or provided the appropriate interventions to prevent Resident from developing a pressure injury or allowing Resident's pressure injury to get worse;

    c.  Monitored or evaluated Resident's Care Plan to see if the interventions prescribed were working; or

    d.  Monitored Resident's condition, including Resident's pressure injury.

52.   At no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from defendants or any other staff member ever provide any sort of adequate in-service training or clinical education to the Facility staff regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure injuries in residents like Resident.

53.   At no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from defendants or any other staff member ever implement appropriate policies and procedures at the Facility regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure injuries in residents like Resident.

54.    While Resident was a resident at the Facility, the Facility did not have an adequate number of staff working daily at the Facility to meet Resident's needs, perform the adequate interventions required to prevent Resident's avoidable pressure injury or prevent the progression of Resident's pressure injury, or monitor and adequately supervise Resident's condition.

### Management of the Facility

55.    Campbell Street Services, LLC and Birchwood Healthcare Partners, LLC controls decisions including setting budgets, determining staffing levels, promulgating infection control policies, and accepting resident admissions.

56.    Campbell Street Services, LLC and Birchwood Healthcare Partners, LLC  controls the Facility by setting their staffing levels, choosing, and paying vendors including laboratories that process resident testing, and hiring and firing key personnel. As such, the Facility's administrators lack authority to make significant decisions relating to resident care.

57.    CAMPBELL STREET SERVICES, LLC AND BIRCHWOOD HEALTHCARE PARTNERS, LLC 's control over the Facility violates Kansas State regulations that vest the nursing home administrator—the individual who is on the ground in the facility, with the residents and staff—with the responsibility of managing the Facility and making decisions in the best interests of the nursing home's residents.

58.    Although CAMPBELL STREET SERVICES, LLC AND BIRCHWOOD HEALTHCARE PARTNERS, LLC  purports to be a mere consulting company consulting with the Facility CAMPBELL STREET SERVICES, LLC AND BIRCHWOOD HEALTHCARE PARTNERS, LLC  had knowledge of and control over the Facility's operations.

59.    Their knowledge extended to, among other issues, staffing crises, violations of infection control protocols, and resident neglect and harm. That knowledge stemmed from multiple sources, including communication from the Facility's administrators and DONs, DOH survey deficiency citations, poor scores on federal nursing home quality measures and metrics, and the findings of the Facility's quality assurance committees.

60.    The Facility's administrators and DONs regularly communicated with CAMPBELL STREET SERVICES, LLC AND BIRCHWOOD HEALTHCARE PARTNERS, LLC  about day-to-day operations at the facilities, including about budget, staffing numbers, hiring, admissions, CMS Star Ratings, DOH surveys and deficiencies, and CNA documentation rates.

61.    Defendants' decision to do so leaves the employees in Facility powerless to improve patient care.

62.    CAMPBELL STREET SERVICES, LLC AND BIRCHWOOD HEALTHCARE PARTNERS, LLC  controls, among other things, staffing budgets, admissions, and purchasing decisions.

63. Defendants repeatedly and persistently delegated, and continue to delegate, complete control over the Facility. Indeed, CAMPBELL STREET SERVICES, LLC AND BIRCHWOOD HEALTHCARE PARTNERS, LLC controls virtually every element of the Facility's operations.

64. The administrator at the Facility does not have control over the home's books and records; CAMPBELL STREET SERVICES, LLC AND BIRCHWOOD HEALTHCARE PARTNERS, LLC handles that exclusively. For instance, CAMPBELL STREET SERVICES, LLC AND BIRCHWOOD HEALTHCARE PARTNERS, LLC prepares the Facility's Cost Reports and quarterly and annual financial statements.

65. CAMPBELL STREET SERVICES, LLC AND BIRCHWOOD HEALTHCARE PARTNERS, LLC develops and establishes the staffing levels for each nursing discipline on each shift at the facilities through the implementation of a staffing budget. CAMPBELL STREET SERVICES, LLC AND BIRCHWOOD HEALTHCARE PARTNERS, LLC then closely monitors the staffing levels to ensure that the Nursing Homes stay within the budgets that CAMPBELL STREET SERVICES, LLC AND BIRCHWOOD HEALTHCARE PARTNERS, LLC sets.

**Undercapitalization/Underfunding at the Facility**

66. Facility and CAMPBELL STREET SERVICES, LLC AND BIRCHWOOD HEALTHCARE PARTNERS, LLC had a duty to provide financial resources and support to the Facility in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with their residents' comprehensive assessments and plans of care.

67.    Facility and CAMPBELL STREET SERVICES, LLC AND BIRCHWOOD HEALTHCARE PARTNERS, LLC had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents.

68.    Facility had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff.

69.    No individuals at the Facility are involved in decision making about the financial operations or what its resources were and where they would be spent.

70.    Transactions directed by Facility and CAMPBELL STREET SERVICES, LLC AND BIRCHWOOD HEALTHCARE PARTNERS, LLC left the Facility with insufficient cash to provide sufficient qualified staff to meet the individual needs of the residents in their facility during Resident's time there.

### LEGAL BASIS FOR CAMPBELL STREET SERVICES, LLC AND BIRCHWOOD HEALTHCARE PARTNERS, LLC 's LIABILITY

71.    Facility and CAMPBELL STREET SERVICES, LLC AND BIRCHWOOD HEALTHCARE PARTNERS, LLC are referred to herein as the "Corporate Defendants."

72.    The Corporate Defendant directed, operated, and managed the day-to-day functions of their nursing facilities – including the Facility – by developing and implementing policies, practices and procedures affecting all facets of the Facility, including resident care.

73.    These policies manipulate and control the physical and financial resources and prohibit decision making at the Facility level.

74.     This directly affects resident care by determining things such as what type and quality of nourishment is available for residents; what safety measures may and may not be used depending upon cost; the integrity of the building itself; and most importantly, how much staff is available to provide resident care and how well trained and supervised are the staff to meet the needs of the residents.

75.     These policies and practices were developed and implemented without regard to the needs of the residents and, in fact, mandated the reckless disregard for the health and safety of the Facility's residents.

76.     The Corporate Defendant affirmatively chose and decided to establish such operations and demand they be implemented.

77.     Such operations included, *inter alia*, the following dangerous policies and practices: (a) the aggressive recruitment and admission of high acuity patients to increase the patient census when Defendants had already chosen to understaff the Facility and continually maintain a staff that were not qualified nor competent to provide the care required by state law, regulations and minimum standards of the medical community; and (b) the decision to retain residents whose needs exceeded the qualification and care capability of the Facility's staff.

78.     The Corporate Defendant consciously chose not to implement safety policies, procedures and systems which would ensure that: (a) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (b) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

## Direct Participation/Individual Actions

79.    The Corporate Defendant was always material to this lawsuit in the business of managing, owning, and operating a network of nursing homes throughout the State of Kansas. One such nursing home was the Facility where Resident was admitted for care and treatment.

80.    At all times material to this lawsuit, the Corporate Defendant was fully aware that the delivery of essential care services in each of their nursing homes – including the Facility – hinged upon three fundamental fiscal and operational policies which were dictated by their choices on establishing and implementing such policies: (1) the determination of the numbers and expenditures on staffing levels; (2) the determination of the census levels within the nursing home; and, (3) payor mix.

81.    At all times material, the Corporate Defendant made critical operational decisions and choices which manipulated and directly impacted the Facility's revenues and expenditures.  More particularly, the Corporate Defendant determined:

    a.  The number of staff allowed to work in their chains of nursing homes including the Facility;

    b.  The expenditures for staffing at the nursing homes including the Facility;

    c.  The revenue targets for each nursing home including the Facility;

    d.  The payor mix, and census targets for each nursing home including the Facility;

    e.  Patient recruitment programs and discharge practices at each nursing home including the Facility.

82.    All cash management functions, revenues and expenditure decisions at the nursing home level – including the Facility – were tightly managed, directed, and supervised by the Corporate Defendants.

83.    It was the choices made by the Corporate Defendant which directly fixed the circumstances in the facilities and the level of care that could, and was, provided at the homes, including the Facility.

84.    The Corporate Defendant formulated, established, and mandated the application and implementation of the policies regarding the staffing levels and expenditures, the census levels, and payor mix.

85.    The census edicts, marketing and admission practices, and resident discharge policies designed and mandated by the Corporate Defendant was implemented and such application was carefully supervised and enforced.

86.    Following the mandates, the Facility functioned in accordance with them, filling empty beds, recruiting high acuity patients, and maintaining a census level and staffing level established and enforced as the Corporate Defendant deemed appropriate.

87.    Accordingly, such manipulation by the Corporate Defendant as to staffing and census were motivated by the financial needs of the Corporate Defendant and the Facility as opposed to the acuity levels and needs of the residents as dictated by state and federal laws and regulations.

88.    Instead of abiding by their duty to care for the residents, the Corporate Defendant chose to be guided by financial motivation which was simply to increase revenues while restricting and/or reducing expenses.

89. The Corporate Defendants, therefore, directly participated in a continuing course of negligent conduct, requiring the Facility to recruit and retain heavier care, higher pay residents to the Facility even though the needs of the patient population far exceeded the capacity of staff.

90. At the same time, the Corporate Defendant chose to design, create, implement, and enforce operational budgets at the Facility which dictated the level of care that could be provided and therefore deprived residents care, creating widespread neglect.

91. In so doing, the Corporate Defendant disregarded, superseded, and violated the duties and responsibilities imposed on a licensed nursing home, in this case the Facility, by the State of Kansas, and the federal government.

### Corporate Malfeasance

92. The Corporate Defendant consciously chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

93. Accordingly, the Corporate Defendants, by their operational choices and decision making, and to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.

94. These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the State of Kansas and federal government imposed upon the Corporate Defendant and the Facility.

95.     Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents at the Facility including Resident, failed to receive even the most basic care required to prevent catastrophic injury.  This negligence and resulting injuries ultimately led to and caused Resident's injuries as described above.

96.     During Resident's residency at the Facility, Resident sustained physical injuries and died, as described in more detail above, because of the acts, omissions, decisions, and choices made by the Corporate Defendant in operating the Facility.

97.     During Resident's residency at the Facility, the Corporate Defendant negligently failed to provide and/or hire, supervise and/or retain staff capable of providing Resident with a clean, safe, and protective environment, and that, because of this failure, Resident suffered neglect, abuse, severe personal injuries, conscious pain and suffering, and deterioration of Resident's physical condition as further described above.  Ultimately, Resident died because of this failure.

98.     The Corporate Defendant manage, operate, and direct the day-to-day operations of the Facility and these Corporate Defendant are liable for this direct involvement in the operations of such Facility. These Corporate Defendant are therefore liable to the Plaintiff for the neglect of and injuries to Resident.

99.     The Facility and these Corporate Defendant have been named as Defendants in this lawsuit for their individual and direct participation in the torts and causes of action made the basis of this lawsuit, having:

     a.    Chosen to disregard the duties and responsibilities which the Facility, as a licensed nursing home, owed to the State of Kansas and its residents;

     b.    Created the dangerous conditions described by interfering with and causing the Facility to violate Kansas statutes, laws and minimum

regulations governing the operation of said nursing home;

c. Superseding the statutory rights and duties owed to nursing home residents by designing and mandating dangerous directives, policies, management, and day to day operation of the Facility;

d. Caused the harm complained of herein; and

e. Choosing to disregard the contractual obligations owed to the State of Kansas and the Federal Government to properly care for the residents in exchange for payment of funds for such care.

### COUNT III - (Pain and Suffering v. All Defendants)

100. At all times material hereto, Resident was in a defenseless and dependent condition.

101. MPAC Healthcare is a clinical services company owned by Birchwood Healthcare Partners that fundamentally transforms how medical care is delivered in skilled nursing and assisted living facilities and provided services to Legacy at College Hills in the following ways:

a. **What MPAC Is**: Owned by Birchwood since 2018, MPAC Healthcare provides medical and mental health clinical services in skilled nursing and assisted living facilities. Think of it as a specialized healthcare company that embeds advanced clinical capabilities directly into long-term care settings that typically struggle to maintain such expertise on their own.

b. **Core Services**: MPAC operates through several key service models:

    i. **On-Site Clinical Coverage**: MPAC deploys nurse practitioners and licensed clinical social workers full-time in participating facilities through its on-site model Skilled Nursing NewsPrnewswire. These aren't visiting consultants - they become integral members of each facility's care team, providing coverage for extended hours including weekends.

    ii. **Mental Health Services**: Beyond medical care, MPAC addresses the significant mental health needs in these settings. In addition to its already existing NP and LCSW program, MPAC is in the process of creating a psych component focused specifically on medication management and gradual dose

reduction Skilled Nursing NewsPrnewswire. This holistic approach recognizes that mental health is inseparable from physical health in elderly populations.

   iii. **Telehealth Extension**: For facilities that can't support full-time on-site coverage, MPAC has a telehealth platform that is available to both rural facilities and those who need after hours assistance Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund. This ensures even smaller or remote facilities can access advanced clinical expertise when needed.

c. **How It Works**: The operational model is designed for seamless integration. MPAC's clinicians are highly skilled, clinical force multipliers for each facility they serve. They provide real-time bedside patient encounters designed to proactively detect and treat changes in a patient's condition to prevent further deterioration Birchwood Healthcare Partners - Crunchbase Company Profile & Funding.

   i. Financially, the model aligns everyone's interests. The clinical service comes "free of charge" to the facility as the treatment is billed through a patient's insurance – similarly to an emergency room or hospital Skilled Nursing NewsPrnewswire. Facilities don't bear additional costs, while patients receive better care that's covered by their existing insurance.

d. **Primary Functions**: MPAC serves several critical functions within facilities:

   i. **Early Intervention**: By having advanced practitioners on-site, they catch and treat problems before they escalate into hospitalizations. This proactive approach is the cornerstone of their value proposition.

   ii. **Staff Support and Education**: MPAC NPs also provide ongoing facility staff training and education to reduce variations of quality care. They elevate the capabilities of the entire care team, not just provide their own services.

   iii. **Clinical Stabilization**: During staffing crises or leadership transitions, MPAC provides continuity and expertise that prevents care quality from deteriorating.

e. **Physician Support**: MPAC practitioners handle many routine clinical tasks, freeing attending physicians to focus on their core responsibilities without constant interruptions for minor issues.

f. **Scale and Impact**: The scope of MPAC's operations is substantial and growing. MPAC currently services over 100 facilities and is on track to add 300 new facilities over the next year <u>Skilled Nursing NewsPrnewswire</u>. This rapid expansion reflects the desperate need for their services in an industry facing severe clinical staffing shortages.

   i. MPAC Healthcare's ultimate goal is to reduce hospitalizations and enhance clinical outcomes <u>Skilled Nursing NewsPrnewswire</u>. Data shows they've reduced hospital readmission rates by 25-50% within the first 60-90 days of implementation - a remarkable achievement in an industry where unnecessary hospitalizations are both costly and traumatic for elderly residents.

g. **The Bigger Picture**: MPAC represents Birchwood's philosophy of vertical integration in action. Rather than being passive facility owners, they're actively solving one of the industry's most pressing problems - the lack of advanced clinical capabilities in post-acute settings. By owning and operating MPAC, Birchwood can ensure their facilities have the clinical support needed to provide quality care, meet regulatory requirements, and succeed in value-based payment models.

h. Birchwood owns MPAC Healthcare since 2018, which provides medical and mental health clinical services in skilled nursing and assisted living facilities <u>Skilled Nursing NewsPrnewswire</u>. This platform represents a key operational strategy. MPAC deploys nurse practitioners and licensed clinical social workers full-time in participating facilities through its on-site model <u>Skilled Nursing NewsPrnewswire</u>, essentially embedding advanced clinical capabilities directly into the facilities they serve.

i. The scope of their operational involvement is substantial. MPAC currently services over 100 facilities <u>Skilled Nursing NewsPrnewswire</u>, with plans to dramatically expand. These aren't superficial relationships - the NPs and LCSWs are "embedded" into a facility's clinical team and are able to coordinate with the staff on a regular basis <u>Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund</u>. This integration helps facilities navigate the increasingly complex medical needs of residents while addressing critical staffing challenges that have plagued the industry.

j. Beyond MPAC, Birchwood's operational philosophy encompasses multiple layers of involvement. Through their network of operators and partners, they not only have the ability to acquire, but also the ability to lease and manage healthcare communities, or even asset manage them on behalf of third party landlords Birchwood Healthcare Partners - Overview, News & Competitors | ZoomInfo.com. This flexible approach allows them to tailor their involvement based on specific facility needs and market conditions.

k. Their investment strategy specifically targets operational improvement. Birchwood completed the acquisition of one of the most highly esteemed TLTC communities in the Midwest, recognized with awards for both clinical excellence and leadership Birchwood Healthcare Partners | Institution Profile | Private Equity International, suggesting they seek properties where their operational expertise can maintain or enhance quality standards. Birchwood already has a hospice company and a small home health company, in addition to the MPAC NP/LCSW program Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund, creating a comprehensive ecosystem of services that support their skilled nursing operations.

l. The financial structure of their clinical services reveals their commitment to operational integration rather than merely extracting fees. The clinical service comes "free of charge" to the facility as the treatment is billed through a patient's insurance Skilled Nursing NewsPrnewswire. This model aligns incentives - Birchwood succeeds when their facilities provide better clinical care that reduces hospitalizations and improves outcomes.

m. Their CEO, Isaac Dole, articulated a clear vision for operational excellence. "Having that higher clinical capability to lean on during times of turnover among the DONs and other clinical leaders, has been hugely impactful for stabilizing clinical operations" Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund. This isn't the language of a passive real estate investor but of an organization deeply engaged in the day-to-day challenges of healthcare delivery.

n. **Staff Training and Education**: MPAC NPs also provide ongoing facility staff training and education to reduce variations of quality care.

This isn't passive oversight - their embedded nurse practitioners actively teach and mentor existing staff. MPAC's telehealth capability has been equally as impactful, especially in rural communities, to identify changes in condition faster Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund, expanding training reach beyond just on-site presence.

    i. The impact is measurable. DON's report that their staff is more confident performing their own work by having an MPAC provider on-site. This confidence boost translates directly into better care delivery and likely improved staff retention, as employees feel more supported and competent in their roles.

o. **Addressing the Staffing Crisis**: During a time when long-term care facilities have lost more than 400,000 caregivers since the start of the pandemic Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund, Birchwood's approach provides crucial stabilization. "Having that higher clinical capability to lean on during times of turnover among the DONs and other clinical leaders, has been hugely impactful for stabilizing clinical operations" Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund, according to CEO Isaac Dole.

    i. This isn't just about filling gaps - it's about maintaining continuity of care during turbulent staffing periods. When Directors of Nursing leave or facilities face clinical leadership vacancies, MPAC clinicians provide the expertise and stability needed to prevent care quality from deteriorating.

p. **Recruitment Innovation**: MPAC has been able to work around some of these challenges by building "a more robust recruiting function" Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund. While traditional facilities struggle to recruit RNs and LPNs, MPAC's model offers something different - they recruit advanced practitioners who want to work in post-acute settings, creating an alternative talent pipeline.

    i. Their recruitment philosophy emphasizes flexibility and autonomy. Employee reviews consistently highlight this aspect, with one noting "you can't beat the flexibility of your work hours.

The leadership team is great and will answer all your questions. It is easy to talk to management and I was not micromanaged".

q. **Clinical Force Multiplication**: Rather than simply adding bodies to fill shifts, Birchwood's philosophy treats their clinicians as "clinical force multipliers for each facility they serve". One advanced practitioner can elevate the capabilities of an entire nursing team through mentoring, real-time consultation, and handling complex cases that might otherwise overwhelm floor nurses.

r. **Cultural Integration**: The NPs and LCSWs are "embedded" into a facility's clinical team and are able to coordinate with the staff on a regular basis Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund. This embedding philosophy ensures these aren't outside consultants dropping in occasionally, but integral team members who understand each facility's unique culture and challenges.

s. **Reducing Administrative Burden**: Freed up time because direct supervision is not required - MPAC practitioners handle many time-consuming tasks that would otherwise fall to facility leadership. This allows existing managers and clinical leaders to focus on their core responsibilities rather than being pulled into constant crisis management.

t. **Impact on Facility Marketing and Recruitment**: Facilities partnered with MPAC will have an additional point of distinction when marketing to hospitals, physicians, and the community. This enhanced reputation can help facilities attract better staff who want to work in well-supported environments with strong clinical capabilities.

102. As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care, and treatment.

103. At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

104.    At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing Facility.

105.    These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

106.    These duties required Defendants to have sufficient and qualified staff at the Facility to ensure the proper care for, and treatment of all residents including Resident.

107.    These duties required Defendants to ensure that the Facility's nurses and other staff were properly educated and trained regarding the care for, and treatment of all residents including Resident.

108.    These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

109.    Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

      a.   Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition;

      b.   Failing to adequately assess Resident's risk of developing a pressure injuries;

c. Failing to timely, consistently, and properly monitor, assess, and document Resident's physical condition;

d. Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision;

e. Failing to have enough staff at the Facility to ensure Resident's needs were being met regarding pressure injury prevention;

f. Failing to provide adequate assistive devices and interventions to prevent Resident's pressure injuries;

g. Failing to enact and carry out an adequate Care Plan regarding Resident's increased risk for pressure injuries;

h. Failing to provide adequate assistance and assistive devices to prevent Resident's pressure injuries;

i. Failing to adequately assess, monitor, ensure, and document the administration of adequate nutrition and hydration to Resident;

j. Failing to document the measurement of Resident's wounds adequately and concisely for proper and efficient wound treatment, management, and progression;

k. Failing to prevent the development and worsening of Resident's pressure injuries;

l. Failing to timely report Resident's changes in condition to a physician;

m. Failing to carry out the instructions of Resident's physician;

n. Failing to adequately, timely and consistently prevent, assess, and treat Resident's risk of pressure injuries;

o. Failing to timely transfer Resident to a Facility that could provide adequate care;

p. Failing to properly supervise and train the employees, agents and/or servants of the Defendants who were responsible for the care and treatment of Resident;

q. Failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment, and treatment of pressure injuries in residents like Resident;

    r.   Failing to carry out and follow standing orders, instructions, and protocol regarding the prevention of Resident's pressure injuries;

    s.   Failing to ensure the nursing home was properly capitalized.

    t.   Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiff(s), but which is verily believed and alleged will.

110.   As a direct and proximate result of the individual and collective acts of negligence as described above, Resident was harmed and suffered damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

111.   The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for punitive damages for their grossly negligent care of Resident.

112.   At the time defendants caused and allowed Resident to suffer an avoidable fall, they knew that their conscious disregard to provide adequate staff; properly capitalize Facility, train, and/or supervise their agents, servants and/or employees during 2023 and 2024 created a high degree of probability of injury to residents and consciously disregarded the safety of all residents including Resident.

113.    Accordingly, defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants punitive damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

114.    As a direct and proximate result of defendants' negligence, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

115.    The Estate is entitled to a jury trial as to the amount of punitive damages pursuant to the Seventh Amendment of the United States Constitution *and Jones v. United Parcel Services*, Inc., No. 09–3275 (10th Cir. 2011).

WHEREFORE, Plaintiff prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances.

## Count II- (NEGLIGENCE V. ALL DEFENDANTS)

116.    Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

117.    MPAC Healthcare is a clinical services company owned by Birchwood Healthcare Partners that fundamentally transforms how medical care is delivered in skilled nursing and assisted living facilities and provided services to Legacy at College Hills in the following ways:

   a. **What MPAC Is**: Owned by Birchwood since 2018, MPAC Healthcare provides medical and mental health clinical services in skilled nursing and assisted living facilities. Think of it as a specialized healthcare company that embeds advanced clinical capabilities directly into long-

term care settings that typically struggle to maintain such expertise on their own.

b. **Core Services**: MPAC operates through several key service models:

   i. **On-Site Clinical Coverage**: MPAC deploys nurse practitioners and licensed clinical social workers full-time in participating facilities through its on-site model Skilled Nursing NewsPrnewswire. These aren't visiting consultants - they become integral members of each facility's care team, providing coverage for extended hours including weekends.

   ii. **Mental Health Services**: Beyond medical care, MPAC addresses the significant mental health needs in these settings. In addition to its already existing NP and LCSW program, MPAC is in the process of creating a psych component focused specifically on medication management and gradual dose reduction Skilled Nursing NewsPrnewswire. This holistic approach recognizes that mental health is inseparable from physical health in elderly populations.

   iii. **Telehealth Extension**: For facilities that can't support full-time on-site coverage, MPAC has a telehealth platform that is available to both rural facilities and those who need after hours assistance Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund. This ensures even smaller or remote facilities can access advanced clinical expertise when needed.

c. **How It Works**: The operational model is designed for seamless integration. MPAC's clinicians are highly skilled, clinical force multipliers for each facility they serve. They provide real-time bedside patient encounters designed to proactively detect and treat changes in a patient's condition to prevent further deterioration Birchwood Healthcare Partners - Crunchbase Company Profile & Funding.

   i. Financially, the model aligns everyone's interests. The clinical service comes "free of charge" to the facility as the treatment is billed through a patient's insurance – similarly to an emergency room or hospital Skilled Nursing NewsPrnewswire. Facilities don't bear additional costs, while patients receive better care that's covered by their existing insurance.

d. **Primary Functions**: MPAC serves several critical functions within facilities:

  i. **Early Intervention**: By having advanced practitioners on-site, they catch and treat problems before they escalate into hospitalizations. This proactive approach is the cornerstone of their value proposition.

  ii. **Staff Support and Education**: MPAC NPs also provide ongoing facility staff training and education to reduce variations of quality care. They elevate the capabilities of the entire care team, not just provide their own services.

  iii. **Clinical Stabilization**: During staffing crises or leadership transitions, MPAC provides continuity and expertise that prevents care quality from deteriorating.

e. **Physician Support**: MPAC practitioners handle many routine clinical tasks, freeing attending physicians to focus on their core responsibilities without constant interruptions for minor issues.

f. **Scale and Impact**: The scope of MPAC's operations is substantial and growing. MPAC currently services over 100 facilities and is on track to add 300 new facilities over the next year [Skilled Nursing NewsPrnewswire](). This rapid expansion reflects the desperate need for their services in an industry facing severe clinical staffing shortages.

  i. MPAC Healthcare's ultimate goal is to reduce hospitalizations and enhance clinical outcomes [Skilled Nursing NewsPrnewswire](). Data shows they've reduced hospital readmission rates by 25-50% within the first 60-90 days of implementation - a remarkable achievement in an industry where unnecessary hospitalizations are both costly and traumatic for elderly residents.

g. **The Bigger Picture**: MPAC represents Birchwood's philosophy of vertical integration in action. Rather than being passive facility owners, they're actively solving one of the industry's most pressing problems - the lack of advanced clinical capabilities in post-acute settings. By owning and operating MPAC, Birchwood can ensure their facilities have the clinical support needed to provide quality care, meet regulatory requirements, and succeed in value-based payment models.

h. Birchwood owns MPAC Healthcare since 2018, which provides medical and mental health clinical services in skilled nursing and assisted living facilities Skilled Nursing NewsPrnewswire. This platform represents a key operational strategy. MPAC deploys nurse practitioners and licensed clinical social workers full-time in participating facilities through its on-site model Skilled Nursing NewsPrnewswire, essentially embedding advanced clinical capabilities directly into the facilities they serve.

i. The scope of their operational involvement is substantial. MPAC currently services over 100 facilities Skilled Nursing NewsPrnewswire, with plans to dramatically expand. These aren't superficial relationships - the NPs and LCSWs are "embedded" into a facility's clinical team and are able to coordinate with the staff on a regular basis Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund. This integration helps facilities navigate the increasingly complex medical needs of residents while addressing critical staffing challenges that have plagued the industry.

j. Beyond MPAC, Birchwood's operational philosophy encompasses multiple layers of involvement. Through their network of operators and partners, they not only have the ability to acquire, but also the ability to lease and manage healthcare communities, or even asset manage them on behalf of third party landlords Birchwood Healthcare Partners - Overview, News & Competitors | ZoomInfo.com. This flexible approach allows them to tailor their involvement based on specific facility needs and market conditions.

k. Their investment strategy specifically targets operational improvement. Birchwood completed the acquisition of one of the most highly esteemed TLTC communities in the Midwest, recognized with awards for both clinical excellence and leadership Birchwood Healthcare Partners | Institution Profile | Private Equity International, suggesting they seek properties where their operational expertise can maintain or enhance quality standards. Birchwood already has a hospice company and a small home health company, in addition to the MPAC NP/LCSW program Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund, creating a comprehensive ecosystem of services that support their skilled nursing operations.

l. The financial structure of their clinical services reveals their commitment to operational integration rather than merely extracting fees. The clinical service comes "free of charge" to the facility as the treatment is billed through a patient's insurance <u>Skilled Nursing NewsPrnewswire</u>. This model aligns incentives - Birchwood succeeds when their facilities provide better clinical care that reduces hospitalizations and improves outcomes.

m. Their CEO, Isaac Dole, articulated a clear vision for operational excellence. "Having that higher clinical capability to lean on during times of turnover among the DONs and other clinical leaders, has been hugely impactful for stabilizing clinical operations" <u>Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund</u>. This isn't the language of a passive real estate investor but of an organization deeply engaged in the day-to-day challenges of healthcare delivery.

n. **Staff Training and Education**: MPAC NPs also provide ongoing facility staff training and education to reduce variations of quality care. This isn't passive oversight - their embedded nurse practitioners actively teach and mentor existing staff. MPAC's telehealth capability has been equally as impactful, especially in rural communities, to identify changes in condition faster <u>Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund</u>, expanding training reach beyond just on-site presence.

   i. The impact is measurable. DON's report that their staff is more confident performing their own work by having an MPAC provider on-site. This confidence boost translates directly into better care delivery and likely improved staff retention, as employees feel more supported and competent in their roles.

o. **Addressing the Staffing Crisis**: During a time when long-term care facilities have lost more than 400,000 caregivers since the start of the pandemic <u>Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund</u>, Birchwood's approach provides crucial stabilization. "Having that higher clinical capability to lean on during times of turnover among the DONs and other clinical leaders, has been hugely impactful for stabilizing clinical operations" <u>Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund</u>, according to CEO Isaac Dole.

      i. This isn't just about filling gaps - it's about maintaining continuity of care during turbulent staffing periods. When Directors of Nursing leave or facilities face clinical leadership vacancies, MPAC clinicians provide the expertise and stability needed to prevent care quality from deteriorating.

p. **Recruitment Innovation**: MPAC has been able to work around some of these challenges by building "a more robust recruiting function" Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund. While traditional facilities struggle to recruit RNs and LPNs, MPAC's model offers something different - they recruit advanced practitioners who want to work in post-acute settings, creating an alternative talent pipeline.

      i. Their recruitment philosophy emphasizes flexibility and autonomy. Employee reviews consistently highlight this aspect, with one noting "you can't beat the flexibility of your work hours. The leadership team is great and will answer all your questions. It is easy to talk to management and I was not micromanaged".

q. **Clinical Force Multiplication**: Rather than simply adding bodies to fill shifts, Birchwood's philosophy treats their clinicians as "clinical force multipliers for each facility they serve". One advanced practitioner can elevate the capabilities of an entire nursing team through mentoring, real-time consultation, and handling complex cases that might otherwise overwhelm floor nurses.

r. **Cultural Integration**: The NPs and LCSWs are "embedded" into a facility's clinical team and are able to coordinate with the staff on a regular basis Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund. This embedding philosophy ensures these aren't outside consultants dropping in occasionally, but integral team members who understand each facility's unique culture and challenges.

s. **Reducing Administrative Burden**: Freed up time because direct supervision is not required - MPAC practitioners handle many time-consuming tasks that would otherwise fall to facility leadership. This allows existing managers and clinical leaders to focus on their core responsibilities rather than being pulled into constant crisis management.

t. **Impact on Facility Marketing and Recruitment**: Facilities partnered with MPAC will have an additional point of distinction when marketing to hospitals, physicians, and the community. This enhanced reputation can help facilities attract better staff who want to work in well-supported environments with strong clinical capabilities.

118.    At all times material hereto, Resident was in a defenseless and dependent condition.

119.    As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care, and treatment.

120.    At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

121.    At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing Facility.

122.    These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

123.    These duties required Defendants to have sufficient and qualified staff at the Facility to ensure the proper care for, and treatment of all residents including Resident.

124.    These duties required Defendants to ensure that the Facility's nurses and other staff were properly educated and trained regarding the care for, and treatment of all residents including Resident.

125.    These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

126.    Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

    a.  Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition as well as Resident's condition;

    b.  Failing to adequately assess Resident's risk of fall/falls;

    c.  Failing to timely, consistently, and properly monitor, assess, and document Resident's physical condition;

    d.  Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision;

    e.  Failing to have enough staff at the Facility to ensure Resident's needs were being met regarding fall/falls or fall prevention;

    f.  Failing to provide adequate assistive devices and interventions to prevent Resident's fall/falls;

    g.  Failing to enact and carry out an adequate Care Plan regarding Resident's increased risk for fall/falls;

    h.  Failing to provide adequate assistance and assistive devices to prevent Resident's fall/falls;

    i.  Failing to utilize proper procedures for preventing fall/falls;

    j.  Failing to adequately assess, monitor, ensure, and document the administration of adequate hydration to Resident;

    k.  Failing to prevent the development and worsening of Resident's fall/falls;

    l.  Failing to timely report Resident's changes in condition to a physician;

m. Failing to carry out the instructions of Resident's physician;

n. Failing to adequately, timely and consistently prevent, assess, and treat Resident's fall/falls or risk of falling;

o. Failing to timely transfer Resident to a Facility that could provide adequate care;

p. Failing to properly supervise and train the employees of the Defendants who were responsible for the care and treatment of Resident;

q. Failing to carry out and follow standing orders, instructions, and protocol regarding the prevention of Resident's fall/falls;

r. Failing to ensure the nursing home was properly capitalized.

s. Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiff , but which is verily believed and alleged will be disclosed upon proper discovery procedures during this litigation.

127. As a direct and proximate result of the Defendants' acts resulting in an understaffed and undercapitalized nursing home while Resident was at Facility, Resident was harmed and suffered including pain, suffering, and mental anguish.

128. As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

129. The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for punitive damages for their grossly negligent care of Resident.

130.    At the time defendants caused and allowed Resident to suffer an avoidable fall, they knew that their conscious disregard to provide adequate staff; properly capitalize Facility, train, and/or supervise their agents, servants and/or employees during 2023 and 2024 created a high degree of probability of injury to residents and consciously disregarded the safety of all residents including Resident.

131.    Accordingly, defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants punitive damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

132.    As a direct and proximate result of defendants' negligence, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

133.    The Estate is entitled to a jury trial as to the amount of punitive damages pursuant to the Seventh Amendment of the United States Constitution *and Jones v. United Parcel Services*, Inc., No. 09–3275 (10th Cir. 2011).

**Count III - (Alter Ego Against Birchwood Healthcare Partners)**

134.    Plaintiff  incorporate by reference the allegations previously set forth and further alleges as follows:

135.    Birchwood Healthcare Partners caused the Subsidiary to report to the Centers for Medicare and Medicaid Services that Mission Health Communities LLC exercised operational and managerial control over Subsidiary.

136.    Legacy at College Hill ("Subsidiary") is so dominated by Birchwood Healthcare Partners that the Subsidiary is a mere instrument of Birchwood Healthcare Partners and are indistinct from Birchwood Healthcare Partners.

137.    In fact, the Subsidiary is controlled and influenced by Birchwood Healthcare Partners in that Birchwood Healthcare Partners exercised complete control and domination over the Subsidiary finances and business practices.

138.    Specifically, Birchwood Healthcare Partners' complete control and domination over the Subsidiary caused the Facility's undercapitalization and understaffing while Resident was at the Facility.

139.    Upon information and belief, Birchwood Healthcare Partners' complete control and domination over the Subsidiary caused the Subsidiary to operate at a loss during the years of 2023 and 2024.

140.    Upon information and belief, Birchwood Healthcare Partners' complete control and domination over the Subsidiary caused the Subsidiary's liabilities to exceed its assets by during the years 2023 and 2024.

141.   Specifically: (1) Birchwood Healthcare Partners own all or most of the capital stock of the Subsidiary; (2) Birchwood Healthcare Partners and the Subsidiary have common directors or officers; (3) Birchwood Healthcare Partners finance the Subsidiary; (4) Birchwood Healthcare Partners subscribe to all of the capital stock of the Subsidiary; (5) Birchwood Healthcare Partners caused the incorporation of the Subsidiary; (6) The Facility has grossly inadequate capital; (7) Birchwood Healthcare Partners pay the salaries and other expenses or losses of the Subsidiary; (8) Birchwood Healthcare Partners use the property of the Subsidiary as its own; and (9) The directors or executives of the Subsidiary do not act independently in the interest of the Subsidiary but take their orders from Birchwood Healthcare Partners in the latter's interest.

142.   Thus, Birchwood Healthcare Partners used the corporate cloak of the Subsidiary as a subterfuge to defeat public convenience, to justify a wrong, and/or to perpetrate a fraud in that Birchwood Healthcare Partners' complete control and domination of the Subsidiary depleted all the Subsidiary's assets, thereby making it unable to pay a judgment resulting from its care of residents including Resident.

143.   Moreover, according to **Birchwood's own words** is anything but a passive investor, for example:

   a.   MPAC Healthcare is a clinical services company owned by Birchwood Healthcare Partners that fundamentally transforms how medical care is delivered in skilled nursing and assisted living facilities.

   b.   **What MPAC Is**: Owned by Birchwood since 2018, MPAC Healthcare provides medical and mental health clinical services in skilled nursing and assisted living facilities. Think of it as a specialized healthcare company that embeds advanced clinical capabilities directly into long-term care settings that typically struggle to maintain such expertise on their own.

39

144. **Core Services**: MPAC operates through several key service models:

    i. **On-Site Clinical Coverage**: MPAC deploys nurse practitioners and licensed clinical social workers full-time in participating facilities through its on-site model Skilled Nursing NewsPrnewswire. These aren't visiting consultants - they become integral members of each facility's care team, providing coverage for extended hours including weekends.

    ii. **Mental Health Services**: Beyond medical care, MPAC addresses the significant mental health needs in these settings. In addition to its already existing NP and LCSW program, MPAC is in the process of creating a psych component focused specifically on medication management and gradual dose reduction Skilled Nursing NewsPrnewswire. This holistic approach recognizes that mental health is inseparable from physical health in elderly populations.

    iii. **Telehealth Extension**: For facilities that can't support full-time on-site coverage, MPAC has a telehealth platform that is available to both rural facilities and those who need after hours assistance Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund. This ensures even smaller or remote facilities can access advanced clinical expertise when needed.

b. **How It Works**: The operational model is designed for seamless integration. MPAC's clinicians are highly skilled, clinical force multipliers for each facility they serve. They provide real-time bedside patient encounters designed to proactively detect and treat changes in a patient's condition to prevent further deterioration Birchwood Healthcare Partners - Crunchbase Company Profile & Funding.

    i. Financially, the model aligns everyone's interests. The clinical service comes "free of charge" to the facility as the treatment is billed through a patient's insurance – similarly to an emergency room or hospital Skilled Nursing NewsPrnewswire. Facilities don't bear additional costs, while patients receive better care that's covered by their existing insurance.

c. **Primary Functions**: MPAC serves several critical functions within facilities:

    i. **Early Intervention**: By having advanced practitioners on-site, they catch and treat problems before they escalate into hospitalizations. This proactive approach is the cornerstone of their value proposition.

    ii. **Staff Support and Education**: MPAC NPs also provide ongoing facility staff training and education to reduce variations of quality care. They elevate the capabilities of the entire care team, not just provide their own services.

    iii. **Clinical Stabilization**: During staffing crises or leadership transitions, MPAC provides continuity and expertise that prevents care quality from deteriorating.

d. **Physician Support**: MPAC practitioners handle many routine clinical tasks, freeing attending physicians to focus on their core responsibilities without constant interruptions for minor issues.

e. **Scale and Impact**: The scope of MPAC's operations is substantial and growing. MPAC currently services over 100 facilities and is on track to add 300 new facilities over the next year Skilled Nursing NewsPrnewswire. This rapid expansion reflects the desperate need for their services in an industry facing severe clinical staffing shortages.

    i. MPAC Healthcare's ultimate goal is to reduce hospitalizations and enhance clinical outcomes Skilled Nursing NewsPrnewswire. Data shows they've reduced hospital readmission rates by 25-50% within the first 60-90 days of implementation - a remarkable achievement in an industry where unnecessary hospitalizations are both costly and traumatic for elderly residents.

f. **The Bigger Picture**: MPAC represents Birchwood's philosophy of vertical integration in action. Rather than being passive facility owners, they're actively solving one of the industry's most pressing problems - the lack of advanced clinical capabilities in post-acute settings. By owning and operating MPAC, Birchwood can ensure their facilities have the clinical support needed to provide quality care, meet regulatory requirements, and succeed in value-based payment models.

g. Birchwood owns MPAC Healthcare since 2018, which provides medical and mental health clinical services in skilled nursing and assisted living facilities Skilled Nursing NewsPrnewswire. This platform represents a key operational strategy. MPAC deploys nurse practitioners and licensed clinical social workers full-time in participating facilities through its on-site model Skilled Nursing NewsPrnewswire, essentially embedding advanced clinical capabilities directly into the facilities they serve.

h. The scope of their operational involvement is substantial. MPAC currently services over 100 facilities Skilled Nursing NewsPrnewswire, with plans to dramatically expand. These aren't superficial relationships - the NPs and LCSWs are "embedded" into a facility's clinical team and are able to coordinate with the staff on a regular basis Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund. This integration helps facilities navigate the increasingly complex medical needs of residents while addressing critical staffing challenges that have plagued the industry.

i. Beyond MPAC, Birchwood's operational philosophy encompasses multiple layers of involvement. Through their network of operators and partners, they not only have the ability to acquire, but also the ability to lease and manage healthcare communities, or even asset manage them on behalf of third party landlords Birchwood Healthcare Partners - Overview, News & Competitors | ZoomInfo.com. This flexible approach allows them to tailor their involvement based on specific facility needs and market conditions.

j. Their investment strategy specifically targets operational improvement. Birchwood completed the acquisition of one of the most highly esteemed TLTC communities in the Midwest, recognized with awards for both clinical excellence and leadership Birchwood Healthcare Partners | Institution Profile | Private Equity International, suggesting they seek properties where their operational expertise can maintain or enhance quality standards. Birchwood already has a hospice company and a small home health company, in addition to the MPAC NP/LCSW program Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund, creating a comprehensive ecosystem of services that support their skilled nursing operations.

k. The financial structure of their clinical services reveals their commitment to operational integration rather than merely extracting fees. The clinical service comes "free of charge" to the facility as the treatment is billed through a patient's insurance Skilled Nursing NewsPrnewswire. This model aligns incentives - Birchwood succeeds when their facilities provide better clinical care that reduces hospitalizations and improves outcomes.

l. Their CEO, Isaac Dole, articulated a clear vision for operational excellence. "Having that higher clinical capability to lean on during

times of turnover among the DONs and other clinical leaders, has been hugely impactful for stabilizing clinical operations" Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund. This isn't the language of a passive real estate investor but of an organization deeply engaged in the day-to-day challenges of healthcare delivery.

m. **Staff Training and Education**: MPAC NPs also provide ongoing facility staff training and education to reduce variations of quality care. This isn't passive oversight - their embedded nurse practitioners actively teach and mentor existing staff. MPAC's telehealth capability has been equally as impactful, especially in rural communities, to identify changes in condition faster Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund, expanding training reach beyond just on-site presence.

   i. The impact is measurable. DON's report that their staff is more confident performing their own work by having an MPAC provider on-site. This confidence boost translates directly into better care delivery and likely improved staff retention, as employees feel more supported and competent in their roles.

n. **Addressing the Staffing Crisis**: During a time when long-term care facilities have lost more than 400,000 caregivers since the start of the pandemic Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund, Birchwood's approach provides crucial stabilization. "Having that higher clinical capability to lean on during times of turnover among the DONs and other clinical leaders, has been hugely impactful for stabilizing clinical operations" Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund, according to CEO Isaac Dole.

   i. This isn't just about filling gaps - it's about maintaining continuity of care during turbulent staffing periods. When Directors of Nursing leave or facilities face clinical leadership vacancies, MPAC clinicians provide the expertise and stability needed to prevent care quality from deteriorating.

o. **Recruitment Innovation**: MPAC has been able to work around some of these challenges by building "a more robust recruiting function" Birchwood Healthcare Partners Expands Portfolio with Two

[Strategic Midwest Investments To 5V+ Seniors Healthcare Fund](). While traditional facilities struggle to recruit RNs and LPNs, MPAC's model offers something different - they recruit advanced practitioners who want to work in post-acute settings, creating an alternative talent pipeline.

 i. Their recruitment philosophy emphasizes flexibility and autonomy. Employee reviews consistently highlight this aspect, with one noting "you can't beat the flexibility of your work hours. The leadership team is great and will answer all your questions. It is easy to talk to management and I was not micromanaged".

p. **Clinical Force Multiplication**: Rather than simply adding bodies to fill shifts, Birchwood's philosophy treats their clinicians as "clinical force multipliers for each facility they serve". One advanced practitioner can elevate the capabilities of an entire nursing team through mentoring, real-time consultation, and handling complex cases that might otherwise overwhelm floor nurses.

q. **Cultural Integration**: The NPs and LCSWs are "embedded" into a facility's clinical team and are able to coordinate with the staff on a regular basis [Birchwood Healthcare Partners Expands Portfolio with Two Strategic Midwest Investments To 5V+ Seniors Healthcare Fund](). This embedding philosophy ensures these aren't outside consultants dropping in occasionally, but integral team members who understand each facility's unique culture and challenges.

r. **Reducing Administrative Burden**: Freed up time because direct supervision is not required - MPAC practitioners handle many time-consuming tasks that would otherwise fall to facility leadership. This allows existing managers and clinical leaders to focus on their core responsibilities rather than being pulled into constant crisis management.

s. **Impact on Facility Marketing and Recruitment**: Facilities partnered with MPAC will have an additional point of distinction when marketing to hospitals, physicians, and the community. This enhanced reputation can help facilities attract better staff who want to work in well-supported environments with strong clinical capabilities.

145. Birchwood Healthcare Partners is only able to implement MCPC healthcare at Legacy at College Hills though it complete control and domination over the Subsidiary.

146.    This undercapitalization and understaffing violated Legacy at College Hill's duties and the applicable standard of care owed by a skilled nursing facilities operator or manager to the Facility's residents.

147.    As a direct and proximate result of the individual and collective acts of negligence of the Subsidiary – and Birchwood Healthcare Partners – Resident was harmed and suffered non-economic damages including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life, death, and other damages.

148.    As a direct and proximate result of the individual and collective acts of negligence of the Subsidiary, – and Birchwood Healthcare Partners – Plaintiff , suffered non-economic damages including loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement, and mental anguish.

WHEREFORE, Plaintiff prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances.

**PLAINTIFF'S DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Respectfully Submitted,

STEELE LAW FIRM II, LLC

By:  */s/ Jonathan Steele*
Jonathan Steele KS #24852
2029 Wyandotte, Suite 100
Kansas City, MO 64108
Ph: (816) 466-5947
Fax: (913) 416-9425
jonathan@nursinghomeabuselaw.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that the below-signed Attorney signed the original of the above and foregoing and is maintaining the original copy at said Attorney's office, and that on June 22, 2025 a copy of the above and foregoing was forwarded for service to a Court appointed process server.

*/s/ Jonathan Steele*
Attorney for Plaintiff(s)